# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2019

Lyle W. Cayce

Clerk

No. 18-30268

Consolidated with 18-30269, 18-30270, 18-30271, 18-30281

CLAIMANT ID 100081155,

> Requesting Party–Appellant,

v.

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA PRODUCTION COMPANY; BP, P.L.C.,

> Objecting Parties–Appellees.

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before REAVLEY, ELROD, and WILLETT, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

JME Management, Inc. (JME)—a vacation rental business affected by the 2010 BP oil spill—filed five claims for compensation with the Settlement Program. The Settlement Program determined that JME was a "failed business" under the meaning of the Settlement Agreement and calculated JME's compensation according to the Failed Business Economic Loss framework. The district court granted discretionary review and agreed that JME was a failed business under the Settlement Agreement. Because the

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

district court incorrectly interpreted the Settlement Agreement, we VACATE and REMAND.

I.

A.

Following the Deepwater Horizon oil spill in 2010, BP negotiated and agreed to the Settlement Agreement with a proposed class of individuals and entities. The Settlement Agreement created a framework whereby class members can submit claims to the Claims Administrator and receive payment for approved claims. Under the Settlement Agreement, there are two frameworks for calculating the compensation available to businesses that suffered economic losses resulting from the oil spill. Class members can submit claims under the Business Economic Loss ("BEL") framework or, where applicable, the Failed Business Economic Loss ("FBEL") framework.

Under the BEL framework, claimants are generally compensated for lost profit and lost profit growth, multiplied by a "Risk Transfer Premium" which accounts for unknown and future risks and injuries. By contrast, the FBEL framework uses a business's past earnings to calculate compensation and does not offer a Risk Transfer Premium. The FBEL compensation is calculated by subtracting the "Liquidation Value" from the pre-spill "Total Enterprise Value." A failed business with negative earnings before interest, tax, depreciation, and amortization (EBITDA) for the twelve-month period prior to May 1, 2010, is categorically ineligible for compensation. Moreover, because of the Risk Transfer Premium, businesses that bring claims under the BEL framework are generally entitled to a greater recovery than they would be under the FBEL framework.

The Settlement Agreement defines a failed business as:

2

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

[A] business Entity that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy, or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

Exhibit 6 explains the additional documentation requirements for an FBEL claim. A Claims Administrator determines whether a claimant is an ongoing or failed business and how much compensation is due, and the claimant may request reconsideration of these decisions. Either BP or the claimant may appeal a final decision to the Appeal Panel. The district court retains the discretion to review the Settlement Program's determinations to ensure that the Claims Administrator and the Appeal Panel correctly interpreted and applied the Settlement Agreement.

B.

JME was in the short-term vacation rental business at the time of the oil spill in 2010. In June 2011, JME entered into an agreement with Gulf Blue Vacations Inc. (Gulf Blue), a company founded by JME's sole owner with the members of his family, and sold substantially all of its assets to Gulf Blue in exchange for $800,000.

Subsequently, in May 2013, JME submitted five claims to the Settlement Agreement Claims Administrator, calculating the value of its claims using the BEL framework.[1] However, the Claims Administrator classified and evaluated all five of JME's claims under the FBEL framework. Under the FBEL framework, the Claims Administrator determined that JME was

---

[1] Although the record does not clearly show the exact amount that JME claimed for all five locations, it appears that the total amount claimed would have easily exceeded $1 million after accounting for the Risk Transfer Premium.

entitled to $0 for three locations and denied compensation altogether for two locations.   JME requested reconsideration by the Claims Administrator, seeking valuation under the BEL framework.   However, the Claims Administrator determined that JME's claims were properly evaluated under the FBEL framework, and the Appeal Panel affirmed.   The district court granted discretionary review after consolidating JME's five claims and affirmed the Appeal Panel's decision.  JME appealed to this court, arguing that it was not a failed business under the meaning of the Settlement Agreement.

## II.

JME and BP disagree about the applicable standard of review.   In JME's view, we should review the district court's decision *de novo* as this appeal turns on the interpretation of the Settlement Agreement.   *See In re Deepwater Horizon*, 785 F.3d 1003, 1011 (5th Cir. 2015) ("The interpretation of a settlement agreement is a question of contract law that this Court reviews de novo.").  BP, on the other hand, argues that we should review only for an abuse of discretion because, in its view, the district court did not render an interpretation but merely applied the Settlement Agreement to JME's case. Here, however, JME has raised interpretative issues, which we review *de novo*.

Alternatively, citing to an unpublished case, BP argues that this court has applied the abuse-of-discretion standard when the district court granted discretionary review but affirmed the denial of claim.   *See BP Expl. & Prod., Inc. v. Claimant ID 100169608*, 682 F. App'x 256, 258–59 (5th Cir. 2017).   But this case does not stand for the proposition that BP puts forth.   In *Claimant ID 100169608*, we observed that "[w]e have not yet directly addressed whether the abuse of discretion standard of review varies depending on whether the district court granted or denied a request of review" and declined to resolve the issue because the parties did not brief the issue and the claimant would have

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

lost under either standard. *Id.* at 259 n.3. In any event, we also observed that " '[t]he standard of review is effectively de novo' when the district court is presented with purely legal questions of contract interpretation.' " *Id.* at 259 (quoting *Claimant ID 100197593 v. BP Expl. & Prod., Inc.*, 666 F. App'x 358, 360 (5th Cir. 2016)); *see also United States v. Delgado-Nunez*, 295, F.3d 494, 496 (5th Cir. 2002) ("[A]buse of discretion review of purely legal questions . . . is effectively *de novo* because '[a] district court by definition abuses its discretion when it makes an error of law.' " (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). Thus, we will review the interpretative issues *de novo*.

### III.

We now turn to JME's argument that the district court misinterpreted the Settlement Agreement's definitions of a "failed business." The Settlement Agreement defines a failed business in three ways:

> [A] business Entity that commenced operations prior to November 1, 2008 and that, subsequent to May 1, 2010 but prior to December 31, 2011, either (i) ceased operations and wound down, or (ii) entered bankruptcy, or (iii) otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6.

Because JME has never entered bankruptcy, it would qualify as a failed business only if it either "ceased operations and wound down" or "otherwise initiated a liquidation of substantially all of its assets, as more fully described in Exhibit 6." The district court concluded that the Settlement Program correctly classified JME as a failed business because JME "ceased operations after it sold its assets to another entity." JME challenges, and BP defends, the district court's conclusion under both definitions. We hold that the district court's conclusion was erroneous under both the first and third definitions.

5

A.

The district court's interpretation of the first definition of a failed business was erroneous.

Under the first definition in the Settlement Agreement, an entity is a failed business if it "ceased operations and wound down." The conjunction "and" that separates the phrases "ceased operations" and "wound down" is crucial to interpreting the first definition. "[I]f there are two elements in the construction," then the conjunction "and" generally "entails an express or implied *both* before the first element." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 117 (2012). For example, under "the well-known constitutional phrase *cruel and unusual punishments*, the *and* signals that cruelty or unusualness alone does not run afoul of the clause: The punishment must meet both standards to fall within the constitutional prohibition." *Id.* at 116; *see also Musacchio v. United States*, 136 S. Ct. 709, 714 (2016) ("The parties agree that [the district court's jury instruction] was erroneous: By using the conjunction 'and' . . . the instruction required the Government to prove an *additional* element." (emphasis added)); *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 657 (5th Cir. 1999) ("The endorsement's use of the conjunction 'and' indicates that, to obtain coverage, the insured must satisfy the requirements of *both* the seven-day notice provision *and* the thirty-day reporting provision." (emphasis added)). Likewise, under the Settlement Agreement, having ceased operations or having wound down alone does not render an entity a failed business. It must have *both* ceased operations *and* wound down to be a failed business.

Winding down is commonly defined as a process through which a corporation "collect[s] [its] assets, dispose[s] of any assets that will not be distributed in kind to shareholders, discharge[s] or make[s] provision to

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

discharge its liabilities, . . . and settle[s] the business and its affairs." 30 Fletcher, Corporations § 137:1 (5th ed. 2016). It is an act of "draw[ing] or bring[ing]" a corporate existence "to a close." *Wind, New Oxford American Dictionary* (3d ed. 2010). "For convenience in winding [down], the corporate existence is usually continued either *indefinitely* or for some period limited by law in order to dispose of the corporation's assets and pay creditors." Cox & Hazen, 4 Treatise on the Law of Corporations § 26:1 (3d ed. 2010) (emphasis added).

In interpreting the phrase "wound down," JME argues that the Settlement Agreement requires an entity to have completed winding down by December 31, 2011 to satisfy the "wound down" element. We disagree. As BP notes, the Settlement Agreement does not require that a business "completely" or "fully" have wound down. Moreover, JME's interpretation of "wound down" would require an entity to complete winding down within less than a two-year period. Because winding down is typically a process that could take place over a substantial—or perhaps indefinite—period of time as the business brings its existence to a gradual close, JME's interpretation would thus render the first definition a narrow eye of a needle that only few entities can pass through. The better reading of the first definition of a failed business is to see, first, whether the business ceased operations, and, second, whether it set into motion a process to bring its corporate existence to a close by collecting its assets, disposing of its assets, discharging its liabilities, and taking other actions necessary to conclude the business. *See* Fletcher, Corporations § 137:1.

Although the district court correctly concluded that JME "ceased operations" by transferring almost all of its assets to another corporate entity, *see Claimant ID 100262194 v. BP Expl. & Prod., Inc.*, 745 F. App'x 539, 540 (5th Cir. 2018) (observing that a business ceased operations when it merged

7

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

into a new LLC),[2] the district court's order reveals that the district court did not see "wound down" as an additional element under the first definition of a failed business as it failed to analyze whether JME also wound down. Accordingly, the district court's interpretation of the first definition was erroneous.

B.

Next, the district court also misinterpreted the third definition of a failed business. Under the third definition, an entity is considered a failed business if it "otherwise initiated or completed a liquidation of substantially all of its assets, as more fully described in Exhibit 6." Here, JME and BP mainly disagree about the meaning of the word "liquidation." JME argues that "liquidation" as used in the Settlement Agreement means the sale of assets for the purpose of paying off debts and liabilities. Because it has not sold its assets to pay off its debt, JME contends that it did not "initiate[] or complete[] a liquidation of substantially all of its assets." On the other hand, BP interprets "liquidation" to mean simply disposing of assets. Under BP's interpretation, because JME disposed of its assets by selling them to Gulf Blue, it liquidated substantially all of its assets, thus qualifying as a failed business.

---

[2] BP argues that *Claimant ID 100262194 v. BP Expl. & Prod., Inc.*, 745 F. App'x 539, 540 (5th Cir. 2018), warrants a summary affirmance because the facts are similar and yet we upheld the conclusion that the business that ceased operations was a failed business without inquiring whether it also wound down. One crucial difference that BP forgets is that *Claimant ID 100262194* came to this court after the district court *denied* discretionary review, thus triggering the abuse-of-discretion standard. *See Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017) ("It is not an abuse of discretion to deny a request to review that . . . simply raise[s] the correctness of a discretionary administrative decision in the facts of a single claimant's case." (alteration in original) (quoting *In re Deepwater Horizon*, 641 F. App'x 405, 410 (5th Cir. 2016)). Here, the district court *granted* discretionary review, and we are reviewing the district court's interpretation of the Settlement Agreement *de novo*. Thus, *Claimant ID 100262194*, 745 F. App'x at 540, is not dispositive.

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

JME's interpretation is more persuasive given, and more consistent with, the word's common usage and place in the Settlement Agreement. "Under admiralty law, a contract 'should be read as a whole and its words given their plain meaning unless the provision is ambiguous.'" *Holmes Motors, Inc. v. BP Expl. & Prod. Inc.*, 829 F.3d 313, 315 (5th Cir. 2016) (quoting *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)).

As a threshold matter, dictionaries heavily favor JME's interpretation. "Dictionaries . . . are helpful resources in ascertaining a term's generally prevailing meaning." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 210 (5th Cir. 2007). Black's Law Dictionary defines "liquidation" as "[t]he act or process of converting assets into cash, *esp. to settle debts*," which is consistent with JME's interpretation. *Liquidation, Black's Law Dictionary* (10th ed. 2010) (emphasis added). The sense divider "esp." (for especially) "denot[es] the most common usage [and] suggests that other usages, although acceptable, might not be common or ordinary." *Taniguchi v. Kan. Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) (holding that the ordinary meaning of "interpreter" is one who orally translates, not one who translates writing). Many other dictionaries also favor JME as they list JME's definition as the primary definition and BP's as the tertiary or quaternary definition. *See* Blue Br. at 28 (cataloguing dictionaries); *see also Liquidation, Merriam-Wester's Collegiate Dictionary* (Deluxe ed. 1998) ("1a. (1) to determine by agreement or by litigation the precise amount of (indebtedness, damages, or account) . . . ; 4. to convert (assets) into cash"). These dictionaries, therefore, suggest that the prevailing meaning of "liquidation" is sale of assets to pay off debts.

Contextual clues also support JME's interpretation in two ways. *Cf.* Scalia & Garner, *Reading Law* at 69 ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

technical sense."). First, the two preceding definitions of a failed business provide a hint about how to construe the third definition. *See In re Deepwater Horizon*, 745 F.3d 157, 172 (5th Cir. 2014) (applying *noscitur a sociis*—"words grouped in a list should be given related meaning"). The first two definitions define a failed business as one that either ceased operations and wound up or entered bankruptcy. BP's interpretation that a failed business includes any entity that has sold substantially all of its assets for any reason, even if the entity was simply seeking to reinvest its assets elsewhere, does not fit this list neatly. JME's interpretation of "liquidation" fits the two preceding definitions better as it naturally points to an entity that has found it necessary to sell substantially all of its assets to settle its debts although it may not have left the market or entered bankruptcy.

Second, Exhibit 6 shows that the Settlement Agreement generally contemplates "liquidation" in connection with debt. *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (discussing the "natural presumption that identical words used in different parts of the same act are intended to have the same meaning" although context may ultimately dictate when the meanings diverge (quoting *Atl. Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427, 433 (1932))). The third definition defines a failed business as one that "otherwise initiated or completed a liquidation of substantially all of its assets, *as more fully described in Exhibit 6.*" Exhibit 6 requires a claimant to provide an affidavit certifying that "[n]o bankruptcy filing, asset liquidation, or debt restructuring had been initiated" and thus employs the word "liquidation" in connection with debt. If the claimant has not filed for bankruptcy, Exhibit 6 further requires the claimant to provide "documentation reflecting the company's entry into the liquidation process." The claimant must also provide "[e]vidence of any asset sales, . . . and evidence of any

No. 18-30268
c/w Nos. 18-30269, 18-30270, 18-30271, 18-30281

payments of liquidation proceeds in satisfaction of debt and/or other creditor obligations." Exhibit 6 employs the word "liquidation" in connection with debt, and it should be interpreted consistently throughout the Settlement Agreement. In sum, given the word's generally prevailing meaning, its place in the Settlement Agreement, and its usage throughout Exhibit 6, we hold that an entity must have "initiated or completed a liquidation of substantially all of its assets" to settle its debts to be a failed business under the third definition.

BP argues that this court has already interpreted the word "liquidation" as simply disposing of assets in *In re Deepwater Horizon*, 857 F.3d 247, 250 (5th Cir. 2017) (*Crystal Seafood*). This is not an accurate description of our holding in that case which only opined on fact issues. *See id*. *Crystal Seafood* involved BP's motion for claw-back after a claimant had been awarded compensation based on the claimant's misrepresentation that it did not liquidate substantially all of its assets. *Id*. at 249. It appears that neither BP nor the claimant raised an argument before this court about how the word "liquidation" should be interpreted; instead, the appeal turned on whether the claimant had raised a genuine issue of fact sufficient to survive summary judgment by contradicting its own previous sworn statement. *Id*. at 250. We held that this was insufficient. *Id*. Thus, we reject BP's mischaracterization of our holding in *Crystal Seafood*.

IV.

Because the district court analyzed JME's claims under an erroneous interpretation of the first and third definitions of a failed business, we VACATE and REMAND.

11